### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

DOLPHIN KICKBOXING CO. and
ROGER GOULD,

         Plaintiffs,

v.

FRANCHOICE, INC. and
TANA HUTCHINSON,

         Defendants.

Case No. 19-cv-1477 (MJD/ECW)

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6). (Dkt. 11.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) be granted in part and denied in part.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

The operative Complaint alleges as follows: Plaintiff Roger Gould ("Gould") is an individual citizen of Arizona and resides in Arizona. (Dkt. 1 ¶ 4.) Plaintiff Dolphin Kickboxing Co. is an Arizona corporation with its principal place of business in Arizona. (*Id.* ¶ 5.)

Gould became interested in purchasing a franchise in February 2015 and contacted Defendant FranChoice, Inc. ("FCI") for assistance. (*Id.* ¶ 10.) FCI is a corporation

formed under the laws of Minnesota, with its principal place of business in Eden Prairie, Minnesota.  (*Id.* ¶ 6.)  It is a franchise broker that assists prospective franchisees in identifying, investigating, selecting and acquiring franchises.  (*Id.*)

On FCI's website (https://www.franchoice.com/), FCI held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and that it would match "entrepreneurs like you with the perfect franchise business."  (*Id.* ¶ 11.)  FCI stressed that Plaintiffs could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FCI had "selected . . . as franchise businesses matching [his] requirements."  (*Id.*)  FCI further represented that "[t]hey will be by your side coaching you and making sure you are getting the information you need in order to make the best decision for you."  (*Id.*)

On February 24, 2015, Defendant Tana Hutchinson ("Hutchinson") contacted Gould regarding franchise opportunities.  (*Id.* ¶ 12.)  Hutchinson, an FCI representative, is an individual residing in California and is a citizen of that state.  (*Id.* ¶ 7.)  Hutchinson represented to Gould that Defendants would match Gould to "pre-screened companies" that conformed to Gould's requirements and then act as a "resource for you during your investigation period and can help you deal with any problems you encounter."  (*Id.* ¶ 12.) Hutchinson promised that Defendants would help Gould find a franchise company that matches perfectly with what he wanted.  (*Id.*)

On March 4, 2015, after an initial consultation phone call, Hutchinson sent a letter to Gould detailing the "model" FCI recommended for him and represented that she would serve as "an impartial sounding board" to address Gould's concerns throughout the

2

franchise purchase process, and promised that Gould would not be disappointed with FCI's services.  (*Id.* ¶ 13.)

During phone calls between March 18 and 30, 2015, and in emails between February 24, 2015 and April 13, 2015, Hutchinson made a number of representations to Gould to induce him to purchase a franchise from non-party ILKB, LLC.  (*Id.* ¶¶ 14-15.) Non-party ILKB, LLC ("ILKB") is the franchisor of "iLoveKickboxing.com" franchises, which are fitness facilities dedicated to kickboxing, a form of physical fitness.  (*Id.* ¶ 8.) At all relevant times, ILKB was a New York limited liability company with its headquarters in New York State.  (*Id.*)  ILKB offered and sold franchises only in and from New York State.  (*Id.*)

The representations made by Hutchinson to Gould regarding ILKB included that: ILKB owners were making over $200,000 per year in profits, and this level of profitability for them was normal; if Gould bought three franchises, he could increase his profits; an ILKB franchise was suitable for semi-absentee ownership; no ILKB franchises had ever closed; FCI pre-screened and validated all franchise opportunities; and ILKB passed FCI's screening.  (*Id.* ¶¶ 14-15.)  On April 13, 2015, Hutchinson sent Gould an email, in anticipation of his attending "Discovery Day" at ILKB headquarters, an event intended to introduce a prospective franchisee such as Gould to the franchisor and its personnel, in which she stated "We would expect the President of the company to be an impressive person," and that he would find "these are reputable, trust worthy, and knowledgeable individuals."  (*Id.* ¶ 15(d).)  Gould later attended a "Discovery Day" at ILKB headquarters, at which ILKB representatives told him that a single unit could

generate over $200,000 a year in profits by the second year, that the unit could be operated by an absentee owner, and that ILKB would do all the marketing. (*Id.* ¶ 16.) Gould believed ILKB's representations based on FCI's and Hutchinson's statements that they had "pre-screened" and "validated" ILKB and the numbers. (*Id.*)

In reliance on Defendants' representations, Gould invested $90,000 in franchise fees for three ILKB territories; $346,000 in building out and outfitting the first location; and undertook substantial lease and loan obligations. (*Id.* ¶ 17.) Gould opened his first studio in April 2017 and has incurred losses since then in excess of $150,000 and has not reached the level of profitability consistent with Defendants' representations. (*Id.* ¶¶ 18-20.)

After opening the business, Gould learned that the representations that FCI and Hutchinson had made to him relating to ILKB franchises were untrue, including: representations related to the profitability of ILKB franchises; that ILKB had not experienced any location closures; and that ILKB franchises were suitable for semi-absentee ownership. (*Id.* ¶ 21.)

Defendants also failed to do or disclose their due diligence by not discovering or communicating to Plaintiffs the existence of lawsuits and a bankruptcy related to ILKB's founder and its affiliates. (*Id.* ¶¶ 22-24.) Plaintiffs assert that had they known of this information they would not have purchased any franchises from ILKB. (*Id.* ¶ 24.)

Plaintiffs assert claims for relief against Defendants for their alleged violations of Arizona Consumer Fraud Act, Az. Stat. § 44-1522, and the Minnesota Franchise Act, Minn. Stat. §80C.01, *et seq.* Plaintiffs also assert claims against Defendants for common

4

law fraud and negligent misrepresentation.

Defendants move to dismiss Plaintiffs' Arizona Consumer Fraud Act ("ACFA") and Minnesota Franchise Act ("MFA") claims.

## II.    LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true.  *See Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  In addition, a court must afford the plaintiff all reasonable inferences from those allegations.  *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).  At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Federal Rule of Civil Procedure 8 and meet the principles articulated by the United States Supreme Court in *Iqbal* and *Twombly*.

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[T]he plausibility standard, which requires a federal court complaint to state a claim for relief that is plausible on its face, . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) (internal quotation and citation omitted). "Determining whether a complaint states a plausible claim for relief will, . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

> Following *Twombly* and consistent with *Iqbal*, the Eighth Circuit explained:
>
> While a plaintiff need not set forth "detailed factual allegations," *Twombly*, 127 S. Ct. at 1964, or "specific facts" that describe the evidence to be presented, *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (per curiam), the complaint must include sufficient factual allegations to provide the grounds on which the claim rests. *Twombly*, 127 S. Ct. at 1965 n. 3. A district court, therefore, is not required "to divine the litigant's intent and create claims that are not clearly raised," *Bediako*, 354 F.3d at 840, and it need not "conjure up unpled allegations" to save a complaint. *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006) (internal quotation omitted).

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

If matters outside the pleadings "are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). While matters "outside the pleadings" may not be considered in deciding a Rule 12 motion to dismiss, documents "necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

Thus, while courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned, without converting the motion into one for summary judgment. *Id.*; *see also Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

### III.   ANALYSIS

**A.   Plaintiffs' Claim under the Arizona Consumer Fraud Act**

Plaintiffs allege that Defendants made fraudulent statements and omissions in the course of selling Gould the ILKB franchises and in providing their services to them in violation of the ACFA. (Dkt. 1 ¶ 36.) According to Plaintiffs, the ILKB franchise, the ILKB multi-unit agreement, and the services FCI and Hutchinson provided in "matching" Gould to a "perfect" franchise were "merchandise" within the meaning of the ACFA. (*Id.* ¶ 35.) Defendants argue that Plaintiffs' claim under ACFA fails because there was no transaction and no negotiation between Plaintiffs and Defendants, as required under the ACFA. (Dkt. 13 at 7.) Rather, they assert that the only transaction was between Plaintiffs and ILKB. (*Id.*) The ACFA provides as follows

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, **in connection with the sale or advertisement of any merchandise** whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

Ariz. Rev. Stat. § 44-1522(A) (emphasis added).  The term "merchandise" includes any "objects, wares, goods, commodities, intangibles, real estate or services."[1]  Ariz. Rev. Stat. § 44-1521(5).

Defendants rely on *Sullivan v. Pulte Home Corp.*, 231 Ariz. 53, 290 P.3d (Ariz. Ct. App. 2012), *vacated in part on other grounds*, 232 Ariz. 344, 306 P.3d 1 (2013), for their argument that the ACFA can only apply to unfair practices in connection with a specific sale between parties.  (Dkt. 13 at 6.)  In *Sullivan*, the court found that a second purchaser of a home could not sue the builder under the ACFA because there was no sale or transaction between the builder and the second owner.  *See Sullivan*, 290 P.3d at 454.  In *Sullivan*, the Pulte Home Corporation ("Pulte") sold a home to the original purchaser.  *Id.* at 448.  The original purchaser then sold the home to the Sullivans.  *Id.*  The Sullivans then brought suit under the ACFA, asserting that Pulte concealed an improperly built retaining wall and improperly graded home site.  *Id.* at 453.  In upholding the dismissal of the CFA claim, the court of appeals held that the trial court did not err in dismissing the ACFA claim because Pulte made no representations or statements to the Sullivans "'in connection with the sale or advertisement' of the home."  *Id.* at 454 (quoting Ariz. Rev. Stat. § 44-1522(A)).  The court in *Sullivan* noted that because there was no transaction between the Pulte and the Sullivans, a claim against Pulte for violating the ACFA would not advance the Act's intended function to "provide injured consumers with a remedy to counteract the disproportionate bargaining power often present in consumer transactions.

---

[1]    The Court notes that Defendants are not arguing that the term "merchandise" under the ACFA cannot encompass a franchise.

. . ." *Id.* at 454 (citing *Waste Mfg. & Leasing Corp. v. Hambicki*, 183 Ariz. 84, 88, 900 P.2d 1220, 1224 (Ariz. App. 1995)) (citation omitted).

Subsequently, the Arizona Supreme Court in *Watts v. Medicis Pharm. Corp.*, 239 Ariz. 19, 365 P.3d 944 (2016), rejected a *per se* rule that the ACFA cannot apply without a direct merchant-consumer transaction. In *Watts*, a minor sought medical treatment for acne and received a prescription for Solodyn from her medical provider. *Id.* at 947. Watts received two publications about the drug, including a "MediSAVE" card, which her medical provider gave to her, and was from defendant Medicis, outlining a discount-purchasing program for Solodyn. *Id.* at 947-48. Watts also received information regarding the drug from her pharmacist. *Id.* at 947. The MediSAVE card and its accompanying information stated that "[t]he safety of using [Solodyn] longer than 12 weeks has not been studied and is not known." *Id.* Watts was subsequently hospitalized and diagnosed with drug-induced lupus and hepatitis. *Id.*

The defendant in *Watts* argued that the ACFA was inapplicable to the case because there is no direct merchant-consumer transaction between drug manufacturers and patients. *Id.* at 953. The Arizona Supreme Court, relying on the text of § 44-1522(A), disagreed:

> Thus, the statute does not expressly require a direct merchant-consumer transaction. Rather, to succeed on a claim of consumer fraud, a plaintiff must show (1) a false promise or misrepresentation made in connection with the sale or advertisement of "merchandise," and (2) consequent and proximate injury resulting from the misrepresentation.

*Id.* at 953 (citations omitted). The Arizona Supreme Court concluded that Watts alleged an actionable claim under the ACFA by alleging that the drug manufacturer affirmatively

misrepresented Solodyn by stating that "[t]he safety of using [Solodyn] longer than 12 weeks has not been studied and is not known," even though it knew (as Medicis's full prescribing informational material stated) that taking the drug for longer than twelve weeks can cause drug-induced lupus. *Id.*

Recently, the Arizona Court of Appeals, in also rejecting the contention that a ACFA claim must be based on a direct sale or transaction between the parties, noted that the decisions in *Sullivan* and *Watts* differed in one critical way—the absence of any misrepresentations made by Pulte to the second homeowner versus a misrepresentation made by the drug manufacturer to the ultimate end user of the drug. *See State Farm Fire & Cas. Co. v. Amazon.com Inc.*, No. CV-17-01994-PHX-JAT, 2018 WL 1536390, at *4-5 (D. Ariz. Mar. 29, 2018).

In light of the Arizona Supreme Court's decision in *Watts*, the Court finds that Plaintiffs have adequately alleged a claim under the ACFA. This case is more like *Watts* than *Sullivan* in that the Complaint is replete with misrepresentations allegedly made by Defendants directly to Plaintiffs as part of their services, regarding why Plaintiffs should choose to purchase an ILKB franchise, which Plaintiffs ultimately relied upon to their detriment. (Dkt. 1 ¶¶ 14-18, 21 24.) The fact that the actual franchise was sold by a third party, as argued by Defendants (Dkt. 19 at 4), does not necessarily insulate Defendants from liability. Even assuming that Defendants are not express agents of ILKB, "they are the necessary links in the chain" as to the transaction leading the purchase of the Franchise as alleged in the Complaint by virtue of the services provided. *See generally*,

*In re Fluidmaster, Inc.*, 149 F. Supp. 3d 940, 960-61 (N.D. Ill. 2016) (addressing the ACFA).

For all of these reasons, Defendants' motion to dismiss Plaintiffs' ACFA claim should be denied.

## B.    Plaintiffs' Claim under the Minnesota Franchise Act

According to Defendants, to be covered by the MFA, the sale or offer to sell had to be made in Minnesota.  (Dkt. 13 at 8.)  Defendants, relying upon Minn. Stat. § 80C.19, argue that the MFA cannot apply to Plaintiffs' claims because Plaintiffs have not identified any franchise within Minnesota, and Hutchinson is alleged to reside in California and only communicated to Plaintiffs (non-Minnesota residents) via email and the telephone.  (*Id.* at 8-9.)  Plaintiffs counter with agency and respondeat superior theories, asserting that because Hutchinson[2] is the agent of a Minnesota corporation, the offer originated from Minnesota for the purposes of the MFA.  (Dkt. 17 at 10-13.)

Under Minnesota law:

No person may offer[3] or sell a franchise **in this state** by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Minn. Stat. § 80C.13, subd. 2 (emphasis added).

---

[2]    Plaintiffs do not argue that Hutchinson herself, outside of agency theory, took any actions aimed towards or from Minnesota relating to the present claims.

[3]    Similar to the New York State Franchise Sales Act (as addressed in other related Reports and Recommendations), under the MFA, "offer" and "offer to sell" "includes every attempt to offer to dispose of, and **every solicitation of an offer to buy**, a franchise or interest in a franchise for value."  Minn. Stat. § 80C.01, subd. 16 (emphasis added).

With respect to liability under § 80C.13, the MFA defines an offer to sell or a purchase of a franchise "in this state" as follows:

Subd. 1.  Applicable sales and offers to sell or purchase.  The provisions of sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this state.

Subd. 2.  Offer to sell or purchase made in state.  For the purpose of sections 80C.01 to 80C.22, an offer to sell or to purchase is made in this state, whether or not either party is then present in this state, when the offer originates from this state or is directed by the offeror to this state and received by the offeree in this state.

Subd. 3.  Offer to purchase or sell accepted in state.  For the purpose of this section, an offer to purchase or to sell is accepted in this state when acceptance is communicated to the offeror in this state, and has not previously been communicated to the offeror, orally or in writing, outside this state; and acceptance is communicated to the offeror in this state, whether or not either party is then present in this state, when the offeree directs it to the offeror in this state reasonably believing the offeror to be in this state and it is received by the offeror in this state.

Subd. 4.  Offer to sell or purchase not made in state.  An offer to sell or to purchase is not made in this state when the publisher circulates or there is circulated in the publisher's behalf in this state any bona fide newspaper or other publication of general, regular and paid circulation which is not published in this state, or when a radio or television program originating outside this state is received in this state.

Minn. Stat. § 80C.19.

The MFA "was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry." *Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn. 1982) (citation omitted); *see also Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978).  When the MFA was

introduced as a bill in 1973, it was described as a "bill to give the commissioner of securities some control over the franchising business in the state of Minnesota." *In re Ne. Exp. Reg'l Airlines, Inc.*, 228 B.R. 53, 59 (Bankr. D. Me. 1998) (quoting Hearing on the Minnesota Franchise Act Before the Minnesota Senate, 68th Legis., Reg. Sess. (Minn. 1973) (statement by unidentified senator)). *Clapp*, relied upon by Defendants, dealt with a technical violation of the MFA requiring a person offering or selling a franchise within the state to register with the Commissioner of Securities a proposed public offering statement making full disclosure of all facts required by statute or rules of the commissioner. 327 N.W.2d at 586 (citing Minn. Stat. §§ 80C.02 (1980), 80C.04 (1980) and 80C.06 (1980)). It rendered no analysis in its decision as to whether the defendant was offering or selling a franchise within the state. *Martin Investors*, *supra*, only involved a Minnesota-based franchisee where the defendant published advertisements for consultants in at least two newspapers published within Minnesota; the agent of the defendant discussed the proposed consultant arrangement in a long-distance telephone call with an agent of the plaintiff, who was within Minnesota, and the defendant CCC then mailed a sample copy of its standard consultant agreement to him in Minnesota. *See Martin Investors*, 269 N.W.2d at 873. Based on these facts, the court concluded:

> Through these activities, CCC directly induced a Minnesota resident to enter a contractual relationship upon essentially all of the terms proposed in the sample consultant agreement forwarded to Faye but without the benefit of the full disclosure provided by the registration requirements of the Franchises Act. This is precisely the kind of activity that our act was designed to regulate and that must be subjected to the requirements of registration and full disclosure if the protective purposes of the act are to be realized.

*Id.* The Minnesota Supreme Court went on to reject the notion that an offer made in Minnesota needed to be shown in the "strictest sense of contract law" as requiring too narrow a reading of the MFA as a remedial statute. *Id.* at 873-74. Recently the Minnesota Court of Appeals noted that while the *Martin Investors* court "recognized the legislature's intent in adopting the MFA was to protect franchisees in Minnesota" it did "not address . . . the scope of the MFA."[4] *Cambria Co. LLC v. M&M Creative Laminants Inc.*, No. A18-1978, 2019 WL 3543602, at *2 (Minn. Ct. App. Aug. 5, 2019).

One court in this district has characterized territorial applicability of the MFA as "murky." *Wave Form Sys., Inc. v. AMS Sales Corp.*, 73 F. Supp. 3d 1052, 1062 (D. Minn. 2014). Indeed, courts examining the issue have reached inconsistent results. For example, in *Healy v. Carlson Travel Network Associates, Inc.*, 227 F. Supp. 2d 1080 (D. Minn. 2002), the court rejected an argument similar to the one being presented by Plaintiffs:

> Healy urges that the statute applies because the offer to sell the franchise came from an agent of Carlson, a Minnesota corporation. No authority is cited for the proposition that the MFA applies merely because the franchisor is a Minnesota corporation. Healy concedes that Crider, the Carlson agent he contacted for information and with whom he negotiated the sale, was based in Florida. The newspaper advertisement for Carlson franchise opportunities that Healy responded to, was placed in the Chicago Tribune by Crider's office in St. Petersburg, Florida. The Agreement was presented to and signed by Healy in Illinois. Healy has not demonstrated that the MFA applies to his case.

---

[4]    In *Cambria*, the Court considered, but ultimately declined, a request to certify the following question: "May a non-Minnesota resident claiming to be a franchisee invoke the provisions of the Minnesota Franchise Act where its only connection with Minnesota is the location of the purported franchisor?" 2019 WL 3543602, at *2.

*Id.* at 1088; *see also Klosek v. Am. Express Co.*, No. CIV. 08-426 JNE/JJG, 2008 WL 4057534, at *21 (D. Minn. Aug. 26, 2008), *aff'd*, 370 F. App'x 761 (8th Cir. 2010) ("As the statute indicates, the geographic limits do not apply to the entire MFA, but only to 'the provisions concerning sales and offers to sell.'") (quoting Minn. Stat. § 80C.19, subd. 1) (cleaned up).[5]

At least one court has held that "even where a party to a 'franchise agreement' is a Minnesota corporation, the agreement is not within the purview of the MFA if the franchisee is not located in and does not operate in Minnesota." *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 703 (D. Minn. 2011) (citing *Hockey Enters., Inc. v. Total Hockey Worldwide, LLC*, 762 F. Supp. 2d 1138, 1146 (D. Minn. 2011)). The basis of the court's holding was that the "MFA applies only to 'franchise agreements' within the purview of Minnesota law. Minnesota cannot regulate 'franchise agreements' that are formed and preformed in other states." *Id.* (citing *In re St. Paul & K.C. Grain Co.*, 89 Minn. 98, 94 N.W. 218, 225 (Minn. 1903) (noting that "general rule" is that state statutes apply only to territory of state that enacted the statute)).

In *Candleman Corp. v. Farrow*, No. 9802463, Bus. Franchise Guide (CCH) § 11,635, 1999 WL 35768614 (D. Minn. Feb. 1, 1999), the court found that the MFA

---

[5]     The Court in *Klosek*, distinguished the facts in that case from those in *Healey* as follows:

> And though Ameriprise urges otherwise, it appears that *Healy* chiefly involved misrepresentations in the sale of a franchise, and not other complaints under the MFA. *See id.* at 1083-84. Because the current litigation does not involve a sale or offer to sell, it is distinguishable from *Healy*.

2008 WL 4057534, at *21.

applied to the facts in that case because (1) the franchisor's offer to sell the franchise originated from the franchisor's Minnesota office; (2) the acceptance of the offer was received by the franchisor in Minnesota; and (3) the franchise agreement's choice of law provision provided for Minnesota law. *Id.*

In *Wave Form*, *supra*, the plaintiff, an Oregon company, asserted that the MFA applied to its agreement with a Minnesota manufacturer, because the manufacturer's offer to sell originated from Minnesota and acceptance of that offer was received by AMS in Minnesota. 73 F. Supp. 3d at 1059. The plaintiff argued that the "originated from" language was met when the manufacturer transmitted the agreement from its office in Minnesota to Wave Form in Oregon, and the "received by the offeree in this state" language was satisfied when Wave Form executed and subsequently returned the agreement to AMS in Minnesota for its signature. *Id.* at 1060. In an order on a motion for a preliminary injunction, the court found that "Wave Form's position, while it is seemingly a fair construction of the statutory language, fails to account for the MFA's territorial application that was intended by the legislature," and reaffirmed that the "legislative intent behind the passage of the [Franchise Act] was to protect Minnesota franchisees located within Minnesota." *Id.* (citing *Martin Investors*, 269 N.W.2d at 872). Ultimately, the Court held as follows with respect to whether the plaintiff was likely to prevail on its MFA claim:

> At present, whether Wave Form will likely succeed on the merits of its claim is uncertain. The entirety of Wave Form's position rests on the applicability of the MFA. While a construction of the language of the statute does support Wave Form's position, the Minnesota nexus with the factual predicate is very minimal. Other than receiving an offer transmitted from Minnesota and then remitting acceptance back to Minnesota, Wave Form has had no contact with

Minnesota.  Wave Form has never had a single sale in this state nor does it
have any physical presence here.  While Wave Form does conduct business
in states outside of Oregon, it is undisputed that Minnesota is not one of them.
To construe the MFA broadly enough to apply here given the facts currently
of record in this case is a stretch.

*Wave Form*, 73 F. Supp. 3d at 1061.

This Court's decision must be informed foremost by the plain language of the

MFA.  *See Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001).  Here,

the pertinent portion of § 80C.19, dealing with offers made in this state provides:

Offer to sell or purchase made in state.  For the purpose of sections 80C.01
to 80C.22, an offer to sell or to purchase is made in this state, whether or not
either party is then present in this state, **when the offer originates from this
state** or is directed by the offeror to this state and received by the offeree in
this state.

Minn. Stat. § 80C.19, subd. 2 (emphasis added).  There is nothing in the language of the

statute suggesting that the MFA cannot apply to a foreign franchisee when the offer, in

this case a solicitation, "originates" from Minnesota.  The Court in *Wave Form* conceded

that this was "seemingly a fair construction of the statutory language," 73 F. Supp. 3d at

1060, before ignoring that same language and concluding that the legislative intent

behind the passage of the MFA was to protect Minnesota franchisees located within

Minnesota.  There is nothing in the MFA remotely carving out such an exception.

Indeed, in 1981, the legislature added an exemption to the MFA's registration

requirements under Minn. Stat. § 80C.02, exempting any "offer or sale of a franchise to a

resident of a foreign state, territory, or country who is neither domiciled in this state nor

actually present in this state, if the franchise business is not to be operated wholly or

partly in this state, and if the sale of this franchise is not in violation of any law of the

foreign state, territory, or county concerned."  Minn. Stat. § 80C.03(h) (1981 Supp.).

Had the legislature desired a similar carve-out regarding the prohibitions set forth in

Minn. Stat. § 80C.13 for franchises located outside of the state of Minnesota it could have

included a similar exemption within Section 80C.03.  If the statutory language were

construed as urged by Defendants, Minnesota would be without authority to enforce its

franchise laws against a business located physically within Minnesota, but which directed

its fraudulent efforts towards non-residents **_from_** within Minnesota.  It is unlikely that the

legislature intended such a result.  Instead, the focus, based on the plain language of the

statute is on the nexus of the conduct—whether the solicitations at issue originated from

Minnesota.  *See Candleman*, Bus. Franchise Guide (CCH) § 11,635, 1999 WL 35768614.

Such an interpretation is most consistent with the language of the MFA and the general

rule that Minnesota statutes are to apply to conduct within its borders.

However, the Court cannot interpret the MFA so broadly that it will apply to a

Minnesota company, such as FCI, even through a theory of respondeat superior or agency

as argued by Plaintiffs (Dkt. 18 at 26-29), if none of the illegal acts complained of

originated from Minnesota.  *See Healy*, 227 F. Supp. 2d at 1088.  The Court will not

rewrite the MFA to encompass such acts, regardless of its remedial nature.

The only allegations in the Complaint regarding Hutchinson are that she is an

agent of FCI and that she resided and is a citizen of California.  (Dkt. 1 ¶ 7.)  There are no

plausible factual allegations in the Complaint suggesting that the operative solicitations at

issue originated from Minnesota, including that Hutchinson made the representations

while in Minnesota.  Under the doctrine of respondeat superior, "'the act of an agent

within the scope of his agency is the act of his principal.  The principal is liable because the law attributes to him the act of his agent, with the result that both are liable jointly and severally to the person injured by the wrongful act.'"  *D.W. v. Radisson Plaza Hotel Rochester*, 958 F. Supp. 1368, 1380 (D. Minn. 1997) (quoting *Melady v. South St. Paul Live Stock Exch.*, 142 Minn. 194, 171 N.W. 806, 807 (1919)) (cleaned up).  Even assuming that these doctrines apply to the MFA, they only impute the acts of Hutchinson back to FCI in Minnesota for purposes of liability and do not speak to what matters for the purposes of the MFA—whether the malfeasance at issue originated from Minnesota. It would be a closer question if the Complaint alleged that someone from within FCI in Minnesota directed Hutchinson to make the specific alleged solicitations to Plaintiffs. However, that is not the case here.[6]

    For all of these reasons, the Court finds that Plaintiffs' MFA claim should be dismissed.

---

[6]    Plaintiffs asked that, if the Court finds the Complaint does not state a claim under the MFA, the Court give Plaintiffs leave to amend on the basis of an Independent Consultant Agreement between FCI and its consultants providing that a Consultant may not sell any franchises of franchisors with which FCI has a relationship, such as ILKB, because without FCI, Hutchinson never could have sold an ILKB franchise to Plaintiffs. (Dkt. 17 at 10.)  According to Plaintiffs, this agreement means that the offer "originated" from FCI in Minnesota, "whether or not" Hutchinson was in Minnesota.  (*Id.*)  However, even if there is such an agreement, it does not mean that the representations originated in Minnesota, as it does not change the fact that it is alleged that Hutchinson made the operative allegedly fraudulent solicitations at issue from outside of Minnesota.

## IV.   <u>RECOMMENDATION</u>

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that Defendants' Motion for Partial Dismissal Pursuant

to Rule 12(b)(6) (Dkt. 11) be **GRANTED** in part and **DENIED** in part as follows:

1.      Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt.

11) be **GRANTED** as to Plaintiffs' claim under the Minnesota Franchise Act, and that

the claim be **DISMISSED WITHOUT PREJUDICE**; and

2.      Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt.

11) be **DENIED** as to Plaintiffs' claim under the Arizona Consumer Fraud Act.


DATED: December 19, 2019                    <u>*s/ Elizabeth Cowan Wright*</u>
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge




## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).